IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

SANDRA SUE PETONICK,

                Plaintiff,

        v.                                          Civil Action No. 1:08-CV-15

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**


**I.  Introduction**

A.      Background

        Plaintiff, Peggy Sue Kumpf, (Claimant), filed a Complaint on January 3, 2008 seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on June 19,

2008.[2]  Claimant filed her Motion for Summary Judgment on November 17, 2008.[3]

Commissioner filed his Motion for Summary Judgment on December 16, 2008.[4]

B.      The Pleadings

        1.      Plaintiff's Brief in Support of Motion for Summary Judgment.

        2.      Defendant's Brief in Support of Motion for Summary Judgment.

---

        [1] Docket No. 2.

        [2] Docket No. 4.

        [3] Docket No. 11.

        [4] Docket No. 12.

C.     Recommendation

I recommend that:

1.     Claimant's Motion for Summary Judgment be **DENIED** for the following reasons: 1) the ALJ's credibility analysis was supported by substantial evidence; and 2) the ALJ met his burden in showing that there are jobs available to which Claimant's skills would directly transfer.

2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons as set forth above.

## II.  Facts

A.     Procedural History

Claimant filed an application for Social Security disability benefits (DIB) pursuant to Title II of the Act, 42 U.S.C. §§ 401-433 on January 25, 2005, alleging disability since June 30, 2004, due to irritable bowel syndrome/hemorrhoids, chondromalacia patella, neck problems (arthritis), female problems, allergies, kidney reflux, frozen shoulder, plantar fasciitis/Morton's neuroma/bursitis, TMJ, Carpal tunnel syndrome/Cubital tunnel syndrome (Tr. 44, 57-58).  The claim was denied initially on March 17, 2005, (Tr. 27) and upon reconsideration on October 25, 2005. (Tr. 34).  Claimant filed a written request for a hearing on December 23, 2005 (Tr. 37).

Claimant's request was granted and a hearing was held on December 19, 2006. (Tr. 293-345).  The ALJ issued an unfavorable decision on May 24, 2007 (Tr. 12-22).  The ALJ determined Claimant was not disabled under the Act because she could perform a reduced range of sedentary work, including the representational occupations of information clerk/receptionist or billing and cost rate clerk.  (Tr. 15-22).  On June 20, 2007, Claimant filed a request for review

of that determination. (Tr. 10). The request for review was denied by the Appeals Council on November 1, 2007 (Tr. 5-7). Therefore, on November 1, 2007, the ALJ's decision became the final decision of the Commissioner for purposes of judicial review under 42 U.S.C. § 405(g).

Having exhausted her administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.    Personal History

Claimant was born on April 27, 1949, making her 58 as of the date of the ALJ's decision. (Tr. 299). Claimant was therefore considered an individual of "advanced age" under the Commissioner's regulations. 20 C.F.R. § 404.1563(e), 416.963(e) (2008). Claimant has a master's degree in secondary education administration and has attended workshops and training programs for evaluations, grading, special education, supervision, and computer classes for various programs and their application. (Tr. 66). Claimant worked as an assistant high school principal from July, 1985, through the date of her alleged disability. Prior to that, she was a high-school science teacher for fourteen (14) years. (Tr. 59).

C.    Medical History

**P. Kent Thrush, M.D., 4/2/81-3/30/83, (Tr. 129)**
4/27/81
Symptoms - early arthritic problems and degenerative disc disease in her neck. Some neck stiffness and pain which radiates in between the shoulder blades and into the right shoulder. No neurologic defects. Improving in the past 2-3 weeks. Dr. Thrush ordered a soft collar and told patient to soak it as much as possible. The next step would be traction.
3/30/83
Patient is a runner who is having problems with pain in the right foot. She may have a stress fracture. X-ray ordered

**Morgantown Orthopedic Associates, 6/23/87-7/20/87, (Tr. 130-31)**
6/23/87
Problem: 1) left knee pain and 2) right foot pain
History: Two (2) year history of injuring her left knee in exercise. Began getting swelling with

burning about a month ago. Two (2) weeks ago she was getting a clicking and grinding sensation with feelings of giving way. She has problems going up and down stairs and squatting. She also states she has pain between the 3rd and 4th metatarsal heads when she walks.
Assessment: 1) Chondromalacia patella; 2) Morton's neuroma
Recommendations: Patient sent to MPTA for an exercise rehabilitation patellar protection program. Prescribed Motrin 600mg t.i.d. Metatarsal mounds for her shoes.

7/20/87
Patient's knee is minimally symptomatic and much better. Foot is still bothering her slightly. Long-term program discussed.

**Mohammad Roidad, M.D., New Patient Consultation, 5/7/92, (Tr. 132-133)**
Reason for Consultation: Rectal bleeding with abdominal pain and a family history of colon cancer.
Impression: Rectal bleeding with non-specific abdominal discomfort with constipation. The bleeding is most consistent with local bleeding, but a colonoscopy is the best way to screen her bowel.

**Morgantown Orthopedic Associates, Greg M. O'Malley, MD, Progress Notes, 5/7/93-12/9/94 (Tr. 154-158)**
12/9/94
Continued stiffness and soreness in the left shoulder, although it is relatively mild. She has essentially full range of motion. She has mild symptoms of carpal tunnel syndrome on the left. She also has carpal tunnel syndrome on the left with a positive Tinel's sign and positive Phalen's test but no thenar atrophy.

**David Ferrero, DPM, Progress Notes, 5/23/01-11/6/01 (Tr. 159-163)**
SOAP Note 11/6/01
Patient presents with the chief complaint of continued soreness in the area of the 2nd digit from a hammer toe deformity which is causing a corn formation on the dorsal aspect of the PIPJ. Also complains of tenderness and pain especially when she's walking and even at night lately.

SOAP Note 9/25/01
No new medical problems

SOAP Note 6/12/01
Patient presents with chief complaint of continued soreness in the area of the 2nd interspace of the left foot. Awaiting custom molded orthotics for her pronation

SOAP Note 6/5/01
Patient presents with continued soreness in the left foot.

**Nick Zervos, M.D., 11/21/01-11/3/04, (Tr. 169-171)**
Dr. Zervos was Claimant's primary care physician. She sought treatment for pain in her knee,

shoulder, and groin.  On November 3, 2004, Claimant complained of a lot of anterior knee pain bilaterally.  It is getting worse going up and down steps.  History of left frozen shoulder.  She is having some posterior cervical pain that radiates into the back of her shoulders.  She also complains of left 5th finger burning and tingling and associates that with her neck.  She also complains of right groin pain with activities.

Physical Examination - shows her to have bilateral anterior knee pain, normal stability, normal alignment, no significant medial joint line pain.  No signs of any meniscal pathology and normal ligamentous exam.  Examination of her shoulders show her to have full range of motion, no instability.  Examination of her neck did have mild range of motion loss and deficits.  Examination of her left elbow shows her to have a cubital tunnel starting with a Tinel's and a positive flexion pinch test.  Examination of her groin shows her to have full range of motion, no restricted motion.

Impression/Plan - Dr. Zervos thinks she has mild early arthritis and some patellofemoral symptoms to be treated with physical therapy and icing.  Dr. Zervos advised her to avoid flexion exercises.

**Richard Simpson, M.D., Progress Notes, 12/1/04-2/25/05, (Tr. 172-177)**
Dr. Simpson was Claimant's family doctor.  On February 25, 2005, Dr. Simpson found Claimant to have normal vision, hearing and speech.  She had normal gait and station, fine motor ability, gross motor ability and joints.  She had abnormal range of motion in her neck.  Her reflexes, sensory deficits, motor strength, coordination, and mental status were found to be normal.  Her respiratory, cardiovascular and digestive systems were found to be normal.

**Physical Residual Functional Capacity Assessment, 3/14/05 (Tr. 178-185)**
Claimant can occasionally lift and/or carry 50 lbs.  She can frequently lift and/or carry 25 lbs.  She can stand and/or walk (with normal breaks) for a total of about 6 hrs., in an 8-hour workday.  She can sit (with normal breaks) for a total of about 6 hrs. in an 8-hour workday.  Her ability to push and/or pull is unlimited.  She can occasionally climb ramps/stairs/ladders/ropes and scaffolds.  She can frequently balance, stoop, kneel, crouch and crawl.  No manipulative, visual or communicative limitations were established.  Claimant's only environmental limitation was to avoid concentrated exposure to hazards such as machinery, heights, etc.

**Atiya Lateef, M.D., Physical Residual Functional Capacity Assessment, 10/11/05 (Tr. 192-199)**
Claimant can occasionally lift and/or carry 50 lbs.  She can frequently lift and/or carry 25 lbs.  She can stand and/or walk (with normal breaks) for a total of about 6 hrs. in an 8-hour workday.  She can sit (with normal breaks) for a total of about 6 hrs. in an 8-hour workday.  Her ability to push and/or pull is unlimited.  She can frequently climb ramps/stairs, but only occasionally ladders/ropes/scaffolds.  She can frequently balance, stoop and crouch.  She can occasionally kneel and crawl.  No manipulative, visual or communicative limitations were established.  Claimant should avoid concentrated exposure to extreme cold and hazards such as machinery, heights, etc., otherwise, her environmental limitations are unlimited.

Dr. Lateef reduced Claimant's RFC due to likely mild degenerative joint disease of knees and hammer toes.

**Brian D. Houston, M.D., 2/2/06, (Tr. 208, 240)**
On February 2, 2006, Dr. Houston wrote to Dr. Zervos in regards to Claimant's office visit on 2/2/2006. Dr. Houston diagnosed Claimant with fibromyalgia syndrome, mild osteoarthritis of the cervical spine, mild osteoarthritis of the knees and hammertoes. On physical examination, Dr. Houston found Claimant to have allodynia. She has a tender point of the lateral epicondyle of both elbows. She has a tender point of the junction of the 2nd rib and sternum bilaterally. She has a tender point of the mid-portion of the trapezius muscle both left and right. She has a tender point at C5 both left and right. She has no occipital tender point. She has no supraspinatus tender point. She has a tender point overlying both SI joints. She has a tender point of both buttocks. She has a trochanteric bursal tender point both left and right. She has a medial fat pad tender point both left and right. Reflexes are 1+ and symmetrical in the lower extremities. Muscle strength is normal. Gait is normal. She was ordered to continue her stretching and her exercise program and walking.

Dr. Houston saw Claimant on other occasions in 2006 and continued to find Claimant had fibromyalgia syndrome. Claimant's last visit with Dr. Houston prior to the hearing was on September 6, 2006. He again confirmed the positive trigger points and recommended she continue to exercise.

**MVA Fairmont Clinic, Roberto A. Cunanan, M.D., 5/2/2006, (Tr. 287)**
In May, 2006, Dr. Cunanan diagnosed Claimant with osteoporosis of the lumbar vertebrae and left femoral neck.

D.     Testimonial Evidence

Testimony was taken at hearing held on December 19, 2006. The following portions of

the testimony are relevant to the disposition of the case:

Q     How often do you drive in a typical week at the present time?

A     Probably at least five or six times a week.

Q     Typically where are you going when you do drive?

A     Generally I'm either going to the grocery store or to the Nautilus Connection

where I do my therapy.

*          *          *

Q    When you drive, you can drive by yourself?

A    Yes, sir, for short periods of time.  I can't drive any long distance.

Q    And when, well you have to give me an idea of what you mean by long.

A    If my husband and I are traveling together - -

Q    Uh-huh.

A    I can't drive myself for more than about an hour or hour and a half.

                        *            *            *

Q    Okay.  What income of your own do you have at the present time?

A    When I resigned in 2004 I was eligible for retirement so I do have a teacher

retirement.  It's approximately $38,000 a year.

Q    And the, the, the teacher retirement, was that a, a regular retirement based on the

number of years you had served - -

A    Yes.

Q    As opposed to a disability retirement?

A    That's correct.  I had more than 30 years of service and then you're eligible.

Q    Eligible?

A    Yes, sir.

Q    No matter what your age is?

A    Well, you have to be, you have to have, be 55 and have at least 30 years and I was

beyond both of those.

Q    Okay.  So, and you've been essentially getting that since you stopped working,

the retirement?

A        That's correct.

                              *              *              *

Q        And what other administrative jobs did you hold before being an, an assistant

principal?

A        I, I went from the classroom teaching directly into the assistant principal shift.

And I might add my certification is secondary education only so in Marion County where I

reside there had not been a lot of opportunities for secondary principalships.

Q        Because there's only - -

A        There, there are three high schools - -

Q        High schools.

A        That the people who were in those positions had been in those positions for quite

some time.  The year before I resigned I had been offered the principal's job at Fairmont Senior

High School which is also called Westside sometimes.  And I had to decline that position

because I was barely hanging on doing the assistant principal job and I didn't feel that my health

would allow me to take on a principalship but, of course, for 18 years that had been my goal to

be a principal.  But, I wasn't able to take that.  And then the summer that I resigned when I told

the superintendent that I was going to resign, he formatted another position he wanted me to take

in order to get me out of night work because the night work was becoming extremely difficult for

me.  I could hardly get through the regular day plus the night work.  But it was going to be an

itinerant job between all three high schools in the county.  Having been in the administrative

position for 19 years I had found that stress was a major factor that affected my condition as, as

time went by and I just couldn't imagine being an assistant principal itinerant at three high

schools was going to be something that I would be able to do.

*          *          *

Q      So in your, in the job as the assistant principal, physically what did you have to do?  Normally those types of jobs you can most or a lot of skilled work you can sit down a lot.  Your job, if you're doing some types of supervision, you might have had to been up walking around, checking on classrooms and stuff of that nature.  But how did you, how did you perform your job?

A      Over the, over the years because like I said I did it for 19 years so I had different jobs and you pretty much did whatever needed to be done.  Now on a regular daily basis I had to walk and supervise between classes, before school, after school bus duty and at lunchtime and we had two lunch periods so that was pretty much standing and walking around because you really can't supervise students in a cafeteria open situation sitting.  You just can't see what's going on.  And then I put - -

Q      All right.  Then so why, why did you, you stop working then?  Why did you decide to retire?

A      Okay.  Approximately five years before my retirement I started having a lot of what I call kind of isolated problems and some even prior to that.  I was having a lot of trouble with my knees, with my neck, with my arms, was having a lot of foot problems, bursitis, tendonitis, et cetera.  But they were kind of isolated and I would go to a specialist and get therapy or treatment, you know, and it seemed to get better.  Then within the last three years that I worked I was just having a very difficult time functioning.  Fortunately I had a principal who was very understanding and he would quite often say I've got things covered tonight.  You don't

9

have to come.  I know you're in a lot of discomfort.  You know, don't worry about coming down

for lunch today, you know, I'll cover that.  But I, I felt that I was not doing the designated job

that I signed on to do.  Other people were quite often covering for me.  I found that I began to,

you know, make a few errors, nothing that was life threatening or drastic and I felt some of that

was due to my lack of concentration because of either fatigue or discomfort that I had.  It's a job

that requires a lot of multi-tasking.  It's hard for me to admit that I had gotten to the point I

couldn't multi-task very well.  So three years before - -

Q      Well, some of that comes just from getting older, too.

A      Well that could be, too, but I didn't feel I was that old yet.

Q      Okay.

A      Maybe, it may be that I was.  Maybe I have a different of what old is.  Old

seemed to be - -

Q      Oh, I don't know.

A      My parents.

Q      I mean, we're, work, working with a bunch of high school kids every day, you

know, can probably be pretty stressful.

A      Well, it is stressful.  There's no question about that.  And, and, and I probably am

pretty much obsessive compulsive about things and I like things to be done right and done

properly and I felt I was having a difficult time getting that done.  So three years before I

actually resigned I had talked to the then superintendent about resigning and he and the principal

decided to make a few changes in my job assignment although that was really directly the

principal's decision.  But they collect, when I told him I was going to resign they got together

and, and came up with a few changes. And even with those changes I no longer was calling substitutes in the morning which was really causing an issue for me. And I was in charge of the use of the building which meant all of the people needed to run the building for other organizations who might be coming in, that was my responsibility. So there were some changes that were made there. But ultimately the summer that I decided I just couldn't go back to work was the summer I was offered that itinerant job and I thought I, you know, I can't do what I'm doing now. I don't think I can do anything different.

Q       Did you, did you think about going back to the classroom? I mean, so that you got, basically instead of having 900 juvenile delinquents you had 30 juvenile delinquents to deal with? I shouldn't say that but I mean - -

A       Well, I felt that if, if I were, if an opportunity had arisen that I could have gone back to the classroom because there has to be a job, you know, first of all to go into.

Q       Right.

A       But if that had arisen you don't have the flexibility with that I even had as an administrator where, you know, I could sit down if I really felt I needed to in given situations or I could walk around if I had to in given situations. It probably wasn't always the most professional thing that I, you know, would choose to do but I had to where in the classroom you not only have those students that you also have to impart the information and, and, you know, educate them, but you also have the preparation and, and the you know, culmination of evaluation which a lot of that has to be done after hours. So I don't think that would have made much change either stress wise or activity wise from what I already was doing.

Q       Okay. So you, you, stopped working then. Did you feel better after you stopped

working?

A      Actually I did.  I was able to, you know, rest when I needed to.

Q      Came out that door the last day, you ran down the steps - -

A      No.  Actually, actually - -

Q      Saying - -

A      I thought I should be a 100, I thought I should be feeling - -

Q      Hooray?

A      Great and I wasn't.  So I, I knew something was wrong but, and I knew what diagnosis I had, you know, prior to the, to my resigning and I kept saying something's wrong. I'm not working.  I should be feeling great.  I should be feeling 100%.  I shouldn't be having all these aches and pains.  So I went to my regular doctor, Dr. Richard Simpson and there's a history of rheumatoid arthritis in my family which had kind of been being checked all along anyway just to make sure that I didn't have it.  And he did the book work and he said it came back negative and at that time I was also in treatment through Dr. Zervos [phonetic] who is an orthopedic surgeon here in town.  And so through him, he recommended I go back to Dr. Houston.  I had been referred to Dr. Houston back in the early 90's by my then current family physician, Dr. Horner.  He thought at that time I might have rheumatoid arthritis.  So over the years I don't know whether these doctors were looking at my family history and saying, oh grandma had rheumatoid arthritis, maybe she does, but it had never shown up.  So when I went back to Dr. Houston last February, at that time he asked me what was - -.

Q      February of '06?

A      Yes, sir, which was, you know, two, a year and a half after I had actually quit

working and it was at that time that he diagnosed the fibromyalgia. And he felt that because I had exercised for so long as a method of trying to ward off the osteoarthritis problems that I had that that might have kept the fibromyalgia kind of, some of the symptoms hidden or controlled through the, and so we started on some different medications which I haven't had much success with because of side effects. But he really encouraged me to continue the exercising. I haven't been able to do quite what I used to do, you know, five, 10 years ago but I am able to continue with the therapy.

Q      And what's that consist of?

A      There is some weight training and controlled walking. I use an elliptical or a treadmill for that walking. I only walk outside when I don't have access, you know, to the treadmill or the elliptical.

Q      And when you do your, your walking, how far do you normally walk?

A      I, I try to walk for about 30 minutes. That's usually about the max that I can, again on the elliptical or, or on the treadmill.

Q      Do you ever use a stair climber?

A       Stair climbers really, really bother my knees and it's been recommended that I not use those.

Q      So, and how many, how many days a week do you do that?

A      I try to do five. Sometimes I'm able to get in six, but it just depends a lot on, you know, how I'm feeling and what I'm able to do.

Q      And do you walk every day or do you have a, do you lift weights one day and walk the other day?

A       I find I'm much more flexible if I can walk a little bit every day so I normally walk 30 minutes three days a week, walk 12 minutes on the days that I do weight lifting.

Q       How about swimming?  Do you do any swimming?

A       I have in the past.  I haven't been doing it real recently.  The time that is most convenient for me to go to the Nautilus, there are a couple of other classes going on and it's pretty crowded.  So I can't do - -

Q       I don't want to be facetious, but if you' re retired why, why can't you go anytime you want?

A       Well, and, and I can and, and I could go later in the day.  I, you know, I guess we all are creatures of habit and you kind of get on a schedule so and sometimes after I've done the weight training and everything I'm honestly too tired to do much else.  But, I could do swimming additionally.

                    *              *              *

Q       So the, tell, how do you occupy yourself now since you're not working?  Give me a typical day.  What time do you get up, what you do in the morning, what you do in the afternoon?

A       Okay.  I usually get up between, around 7:00 or 7:30 and have breakfast.  I have irritable bowel and that usually gives me troubles in the morning.  That was another issue when I was working was getting up and trying to go through normal functioning and get ready to get, to get to school.  So I usually have breakfast and it takes me about an hour.  I eat my breakfast; usually look over the paper so at least I know what's going on in the world.  Do normal chores, you know, like make the bed, get cleaned up.

*   *   *

Q So you never had any, I mean, you've never had any injury such that you had to have surgery, like a - -

A No, sir.

Q Torn ligament or a - -

A No, sir.

Q Okay.

*   *   *

Q How far can you walk on level ground without having to stop and rest?

A If it's level I'm sure I could walk for 30 minutes.

*   *   *

Q Now how about just standing?  If you're working a counter or folding laundry or just standing doing food preparation, can you stand for 30 minutes or an hour at a time without having to sit down?

A I don't think I could do an hour.  I've actually never really timed.  I, I know I get real fatigued when I'm like working in the kitchen or if I have to stand like going shopping.  I can't go shopping for very long because standing really is uncomfortable.

*   *   *

Q How about sitting?  Any problem sitting like you're doing here today?

A Yes.  Usually about an hour and then I really need, in a chair I can move around and, you know, get some relief.  But after about an hour I usually need to move around.

*   *   *

Q        How much weight can you pick and carry?

A        I probably could lift, I, I don't know.  It's hard to say.  But to hold it and carry it for very far, I wouldn't be able to because I don't, my arms fatigue real easily.

Q        Well, when you're doing, I mean, do you do, what type of upper body exercises do you do when you're at the gym if you're working on your nautilus?

A        Okay.  Again, these are on the nautilus machines and I do like a bicep and a tricep.  I do an overhead pull machine.

Q        And how much weight do you use?

A        Okay.  I can, I can lift around 120 pounds on those, in that, you know, control.  But I don't think I could lift 120 pounds otherwise.

                    *                    *                    *

Q        The, and so you think you can lift and carry 15 to 20 pounds?

A        I, I would assume for a short distance.  I probably could.

                    *                    *                    *

Q        Do you have any trouble dressing yourself?

A        No, sir.  Well, except panty hose this morning.  I had not worn them for a long time but that probably doesn't - -

Q        Household chores, I mean you do the typical things like - -

A        Okay.

Q        Dishes and - -

A        I had a cleaning lady who had worked for me up until the, this last year.

Q        Uh-huh.

16

A       And she quit working and so what I've been able to do, I have not hired anybody else. But I just spread the chores out over. I never have everything clean at one time. So I like, you know, do kind of one floor one day and another floor and eventually and then my husband does all of the vacuuming and does most of the cleaning of the, like the bathtubs because it's hard for me to, to reach in them and do the circular motion for three bathrooms so - -

Q       Do you take care of paying the bills?

A       We, we both do that.

Q       Do you have a checking account?

A       Yes, sir.

*                    *                    *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q       Sue, can you tell the difference between your symptoms from the arthritis and the symptoms from the fibromyalgia?

A       Discomfort and pain is discomfort and pain so I don't know sometimes when like if my knees are hurting, is it relative to the arthritis I have or is it fibromyalgia. So I guess I would have to say no.

*                    *                    *

Q       Where do you have the most difficulty as far as pain is concerned?

A       My knees, my hips, my neck and my arms which kind of extends down into my hands.

Q       All right. How frequently do you have pain in these areas?

A       I have pain in some area all the time but not all the areas all the time. There isn't

a day that I don't have pain somewhere.

Q       Are any of these areas more affected, that you have it more frequently than you have in others?

A       Probably my knees and my neck and my hips are the three most affected areas and it, it's my hips and my arms or shoulders that give me the most trouble sleeping more than anything else.

Q       Now on a, on a scale of one to 10, one being no pain at all, 10 being the worst pain you can think of - -

A       Okay.

Q       Where would you place kind of that baseline pain that you were talking about?

A       Probably a three or a four.

Q       Do you have times when one of these areas flares up?

A       Yeah.  At different times I probably go up to like a seven.  I'm thinking of 10 as being when I've had major surgery and recuperating from that and so I would say there are times the pain is at a seven.   Those are the days I can't go up and down the stairs very well.

                        *                *                *

Q       Okay.  Is that, typically can you get through the rest of your day without resting?

A       No.  It, if I'm doing anything else at all I usually have to, if I'm doing any activity I usually can do somewhere around an hour, hour and a half and then I have to rest for a period of time.

Q       And when you say activity, what kinds of things are you talking about?  The, kinds of activities you've been describing today like the laundry and - -

A        Correct.  That, going to the guy, you know, just anything I'm doing that involves moving around, you know, being active.  I usually have to rest after about an hour, hour and a half.

Q        And then how long do you usually rest?

A        Well, after I come from the gym I usually rest for about an hour.  Otherwise, anywhere from 15 minutes to 30 minutes until I get a second wind and then I can do something else for a while.

Q        All right.  Now then are you able to go back, I mean, are you able to be doing anything while you're resting?  So, for instance, can you go in and sit down and read the newspaper or watch TV and that's rest?

A        I don't normally read the newspaper.  I might, I might have TV on.  I might be watching.  Sometime, I, I listen to the radio a lot, just have the radio on.  But I'm not normally doing anything else.  Like I'm not knitting or anything like that.

                        *              *              *

Q        How, how is the, those, the use of your arms and hands limit, limited?

A        I can't hold anything that weighs very much in my hands.  My, my hands will fatigue real easily.  Like, I can't lift a big pot off of the stove or onto the stove if it's full of something because of danger of dropping it.  If I'm when the Judge asked me what, how much I could lift, if I could hold something against my body I could lift and handle it for a longer period of time.  But to just hold something in my arms I can't do that.

Q        Okay.  For instance, can you pick up a full gallon of milk in one hand, pour it and that's not a problem?

A       Yes, I can do that.

Q       Okay.

A       Yes.

Q       Any problems with small things?

A       No, not really.  I, I drop things a lot.  That, I don't know if that's relative or not.

Q       Any difficulty with writing?

A       No, I haven't noticed any, but I don't do an excessive amount of writing.

                        *               *               *

Q       Now what were your plans as far as your job was concerned?

A       Well my goal was as an administrator and becoming an assistant principal to eventually become a principal.  And the opportunity, as I said, and other than moving somewhere else never became available to me until a time that I thought I was just unable to do the job properly.

Q       Did you have, did you have a plan on when you were going to retire?

A       Well, I thought I'd probably work until I was 62.  I mean, that was my plan.

                        *               *               *

RE-EXAMINATION OF CLAIMANT BY ATTORNEY:

Q       If you were able to have just a, a job where you didn't have all the physical activity that you've had in your principal's job where you were up and walking and moving and those sorts of things, do you think that you could get through an office type job on a full time basis eight hours a day, five days a week?

A       I don't think because I think the fatigue factor would still be there and the, the

pain, the aches would still be there. Then it's hard to concentrate when I'm having those issues so I, I don't think I would be able to.

Q        Have you noticed any, can you give us any examples of how the concentration, you, have created problems for you since you've stopped working?

A        I forget things real easily. When I was working I had to use a lot of Post-it notes and things as a reminder and those had gotten, you know, increased over the years. And, as Judge Moon said, I don't know if that's, I didn't know at that point if it was age or just, you know, something else and I'm still not 100% sure what it was. But I have, I keep, I keep a, a date book, everything written down what I have to do, when I have to do it, still use Post-it notes. I just am more forgetful than I used to be.

*          *          *

Q        With respect to the claimant's past relevant work, would you identify the jobs she's had in the last 15 years from the standpoint of how they're characterized in the Dictionary of Occupational Titles, the skill level and the exertional level. And if he, she did them differently than how they were customarily performed tell us how they're customarily performed in the national economy.

A        That job is classified at the skilled level, Your Honor, at the light level.

Q        Okay.

*          *          *

BY ADMINISTRATIVE LAW JUDGE:

Q        I want you to assume that the claimant would have the ability to do light work; would be limited to only occasional balancing or kneeling or crawling; wouldn't be able to do

work in extreme cold temperatures for long periods of time; wouldn't be able to work at unprotected heights or around dangerous moving machinery. Would she be able to do her past relevant work?

A      I'm sorry, Your Honor, could you repeat that?

Q      I want you to assume the claimant would have the ability to do light work but wouldn't be able to do, wouldn't be able to do more than occasional kneeling and occasional climbing of ladders, ropes or scaffolds; wouldn't be able to work in extreme cold temperatures for long periods of time; wouldn't be able to work at unprotected heights or around dangerous moving machinery. I had talked about limiting her balancing but that's, that was not correct on the, I'm looking at 14F3 so - -

ATTY      Take the balancing off?

ALJ      Yeah, take the balancing off. It's just the limitation of climbing ladders, ropes and scaffolds.

BY ADMINISTRATIVE LAW JUDGE:

Q      So with those limitations would the claimant be able to do her past relevant work?

A      Yes, Your Honor.

Q      I want you to assume that the claimant would be limited to light work as I previously gave you but with additional limitations that the claimant would, could do six hours of standing or walking in an eight hour work day but would not be able to stand or walk for more than a half hour at a time and then would have to be able to sit down for a few minutes; could sit for six hours in an eight hour work day but would have to be able to change position about every half hour if, if sitting. Would she be able to do her past relevant work?

A        Yes, Your Honor.

Q        I want you to assume that the claimant would have the, the ability to do sedentary work.  Would she be able to do any of her past relevant work?

A        No, Your Honor.

Q        If the claimant was limited to doing unskilled work at sedentary, she would grid unless she had transferable skills.  Would the claimant have transferable skills from her past relevant work to work at a sedentary level?

A        Yes, Your Honor.

Q        And basically skills that she would have from her past work that would require only those skills and no other skills?

A        Yes.

Q        Okay.  Could you give me at the sedentary level, could you give me some examples of those types of jobs?

A        Let's see if I understand your question, Your Honor.  Did you say skills outside of her - -

Q        No, that she would have, she could do, she would have developed skills from her past relevant work that she could use at a sedentary job and that sedentary job would require only those skills that she had acquired in her past work and not other skills?

A        Yes, okay.  To respond to your question, Your Honor, the skills of interpersonal relationships, supervisory skills, teaching skills, organizational skills, computer skills, and computational skills.

Q        And can you give me any examples of those types of jobs?

A       Yes.  May I have just a moment?

Q       Sure.

A       I'm ready, Your Honor.

Q       Okay.

A       The occupation of a information receptionist clerk with an SVP of four.  There are over a million jobs in the national economy and at least 2500 in the state of West Virginia.  And also at the sedentary level, semi-skilled a billing and cost rate clerk; 330,000 jobs in the national economy, at least 1740 in the state of West Virginia, all consistent with the DOT.

Q       All right.  Now I'm going to ask you another hypothetical.  I want you to assume a hypothetical, hypothetical individual that could do light or sedentary work but due to her impairments would, the individual would have to lay down or otherwise be off task an hour a day outside her normal breaks or lunch breaks.  Would there be full time, unskilled jobs such a hypothetical person could do in the local or national economy?

A       No, Your Honor.  No jobs.

Q       The same question but instead of being off task an hour a day outside her breaks and lunch breaks, the individual would be absent from work two or three days a month on an ongoing basis.  Would there be any full time, unskilled jobs such a hypothetical person could do in the local or national economy?

A       No, Your Honor. No jobs.

ALJ       All right.  Does the representative have questions?

ATTY       Yes, sir.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q        The information reception clerk position - -

A        Uh-huh.

Q        You said that was an SVP four?

A        Uh-huh.

Q        That's, is that the, the lowest semi-skilled rating?

A        Three is, ma'am.

Q        Okay.  What, what of these skills is applicable to that job?

A        Applicable to the jobs I mentioned?

Q        To the information reception clerk job.

A        Well, interpersonal skills and social interpersonal relationships, organizational skills, being able to respond to inquiries or questions, the dissemination of informational materials and, of course, utilizing the computer, all of those.  I'm sure there are variations even parts of some of the other kinds of skills.

*                    *                    *

Q        Okay.  And the same for the billing and cost rate clerk.  That doesn't, doesn't sound like it involves much interpersonal relationship.

A        No.

Q        What skill is involved there that came from - -

A        Computational skills, organizational skills.

*                    *                    *

E.        Lifestyle Evidence

The following evidence concerning claimant's lifestyle was obtained at the hearing and

through medical records. The information is included in the report to demonstrate how claimant's alleged impairments affect her daily life:

- Eats breakfast and reads the paper (Tr. 76, 317)

- Makes bed and does light household chores (Tr. 76)

- Exercises for about one (1) hour up to six (6) days per week (Tr. 76, 80, 303, 316)

- Goes grocery shopping as needed, usually once per week (Tr. 76, 79, 303)

- Does household chores (including light cleaning, laundry and ironing) and fixes dinner (Tr. 76, 78, 317)

- Watches tv and reads (Tr. 76, 80)

- Takes care of husband (Tr. 77)

- Has no problems with personal care (Tr. 77)

- Prepares meals daily, but cannot hold or lift large pots (Tr. 78, 320)

- Gets outside and walks or drives most days (Tr. 79, 303)

- Able to handle money, including paying bills and counting change (Tr. 79)

- Socializes with people at the gym (Tr. 80)

- Emails family and friends and visits family members at least once per month (Tr. 80)

- Reads (Tr. 100, 140)

- Hobbies include sewing, painting, movies, church activities and gardening (Tr. 100)

### III. The Motions for Summary Judgment

A.     Contentions of the Parties

Claimant contends that the ALJ's credibility analysis is not supported by substantial evidence. Specifically, Claimant argues that the ALJ erred because his statement that Claimant

retired rather than having to stop work due to her impairment is incorrect, the ALJ's finding that

Claimant's conditions were characterized as "mild" is inaccurate as it pertains to her disabling

condition, the ALJ's finding that Claimant's testimony is not credible because she exercises

regularly is an improper finding, and the ALJ's finding that Claimant must be unable to perform the

basic activities of daily living in order to be found disabled is an improper finding.  Claimant also

argues that even if she were found to be capable of full-time sedentary work, the ALJ failed to carry

his burden in showing that there are jobs available to which her skills would directly transfer.

Commissioner maintains that substantial evidence supports the ALJ's credibility

determination.  Specifically, Commissioner notes that the ALJ properly observed Claimant's

medical records which  indicate that she retired from her job; the ALJ accurately found that

Claimant's doctors found that her impairments are mild; and the ALJ properly relied on Claimant's

exercise regimen and daily activities in making his credibility determination.  Commissioner fails

to address Claimant's argument that the ALJ made an improper finding that Claimant must be

unable to perform the basic activities of daily living in order to be found disabled.  Commissioner

also argues that Claimant's skills are transferable to other work in the national economy with very

little adjustment.

B.     The Standards.

1.     Summary Judgment.  Summary judgment is appropriate if  "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,

show there is no genuine issue as to material fact and the moving party is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial

burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S.

317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party

opposing the motion. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587

(1986). However, "a party opposing a properly supported motion for summary judgment may

not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts

showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,

256 (1986).

      2.     <u>Judicial Review</u>. Only a final determination of the Commissioner may receive

judicial review. <u>See</u> 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir.

1986).

      3.     <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears

the burden of showing that she has a medically determinable impairment that is so severe that it

prevents her from engaging in any substantial gainful activity that exists in the national

economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

      4.     <u>Social Security - Medically Determinable Impairment</u>. The Social Security Act

requires that an impairment, physical or mental, be demonstrated by medically acceptable

clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S.

Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§

404.1508, 416.908.

      5.     <u>Disability Prior to Expiration of Insured Status- Burden</u>. In order to receive

disability insurance benefits, an applicant must establish that she was disabled before the

expiration of her insured status. <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42

U.S.C. §§ 416(I), 423C; <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6. <u>Social Security - Standard of Review</u>. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7. <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8. <u>Social Security - Substantial Evidence - Defined</u>. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform her past work; and 5) whether the Claimant is capable of performing any work in the national economy. Once Claimant satisfies Steps One and Two, she will

automatically be found disabled if she suffers from a listed impairment.  If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10.    Social Security - Substantial Evidence - Listed Impairment.  In order for the reviewing court to determine if the Secretary based the agency's decision on substantial evidence, the decision must include the reasons for the determination that the impairment does not meet or equal a listed impairment.  Cook, 783 F.2d at 1168.  The ALJ must identify the standard to be applied.  Id. At 1173.  The ALJ should compare each of the listed criteria to the evidence of Claimant's symptoms and explore all relevant facts.  Id.

11.    Social Security - Listing.  The ALJ must fully analyze whether a Claimant's impairment meets or equals a "Listing" where there is factual support that a listing could be met. Cook , 783 F.2d at 1168.  Cook "does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases." Russell v. Chater, No. 94-2371 (4th Cir. July 7, 1995) (unpublished).[5]  In determining disability, the ALJ is required to determine whether Claimant's condition is medically equal in severity to a listing.  20 C.F.R. §§ 404.1529(d)(3), 416.929(d)(3). The ALJ is required to explain his findings at each step of the evaluation process so that the reviewing court can make determinations on whether his decision is supported by substantial evidence.  Gordon, 725 F.2d 231.  See also Myers v. Califano, 611 F.2d 980, 983 (4th Cir. 1980).

---

[5] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

12. <u>ALJ's Duty to Inquire Into the Evidence</u>. "[T]he ALJ has a duty to explore all relevant facts "[T]he ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." <u>Walker v. Harris</u>, 642 F.2d 712, 714 (4th Cir. 1981). <u>See also</u> <u>Cook v. Heckler</u>, 783 F2d 1168 (4th Cir. 1986). When failure to inquire into the additional evidence is prejudicial to the Claimant then the case should be remanded. <u>Marsh v. Harris</u>, 632 F.2d 296, 300 (4th Cir. 1980).

13. <u>Social Security - Treating Physician - Controlling Weight</u> - The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). <u>See also</u> <u>Evans v. Heckler</u>, 734 F.2d 1012 (4th Cir. 1984); <u>Heckler v. Campbell</u>, 461 U.S. 458, 461 (1983); <u>Throckmorton v.   U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990).

14. <u>Social Security - Treating Physician - Opinion that Claimant is Disabled</u>. An opinion that a claimant is disabled is not a medical opinion within the definition of 20 C.F.R. §§ 404.1527, 416.927. A statement by a medical source that Claimant is disabled or unable to work does not mean that the Commissioner will determine that Claimant is disabled. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). The Commissioner is responsible for making the determination whether a claimant meets the statutory definition of disability. <u>Id.</u> No special significance will be given to the source of an opinion on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3).

15.  Social Security - Treating Physician - Not Entitled to Controlling Weight.  When not entitled to controlling weight, the medical opinion of a treating physician is still entitled to deference and must be weighed according to the following five factors: 1) length of the treatment relationship and frequency of examinations, 2) nature and extent of the treatment relationship, 3) supportability, 4) consistency, and 5) specialization.  20 C.F.R. §§ 404.1527(d), 416927(d).  When benefits are denied, the ALJ must give good reasons in the notice of decision for the weight given to a treating source's medical opinion(s).  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

16.  Social Security - Claimant's Credibility.  "Because he had the opportunity to observe the demeanor and to determine the credibility of the Claimant, the ALJ's observations concerning these questions are to be given great weight."  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976).  "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference.  See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997).  We will reverse an ALJ's credibility determination only if the Claimant can show it was 'patently wrong'"  Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990).

17.  Social Security - Claimant's Credibility - Pain Analysis.  The determination of whether a person is disabled by pain or other symptoms is a two step process.  First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged.  Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective

allegations of pain in light of the entire record.  Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

18.     Evidence Considered in Evaluating the Intensity and Persistence of Claimant's Symptoms and Determining the Extent to Which Claimant's Symptoms Limit Her Capacity for Work.  The Commissioner will take into account all of the following information when assessing a Claimant's subjective complaints of pain: information that Claimant, Claimant's treating or examining physician or psychologist, or other persons provide about Claimant's pain or other symptoms; any symptom-related functional limitations and restrictions which Claimant, Claimant's treating or examining physician or psychologist, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence; all of the evidence presented, including information about Claimant's prior work record, Claimant's statements about her symptoms, evidence submitted by Claimant's treating physician or psychologist, and observations by our employees and other persons; and factors relevant to Claimant's symptoms such as, (i) daily activities, (ii) location, duration, frequency and intensity of pain and other symptoms, (iii) precipitating and aggravating factors, (iv) type, dosage and side effects of pain medication Claimant takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, Claimant receives or has  received for relief of pain or other symptoms, (vi) any measure Claimant uses or has used to relieve pain or other symptoms, and (vii) other factors concerning Claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

19.     Social Security - Residual Functional Capacity.  A Residual Functional Capacity is what Claimant can still do despite her limitations.  20 C.F.R. §§ 404.1545, 416.945.  Residual Functional Capacity is an assessment based upon all of the relevant evidence.  Id.  It may include

descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition.  Id.  Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used.  Id.  These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities.  Id.  This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments.  Id.

20.     Social Security - Vocational Expert. Once it is established that a claimant cannot perform past relevant work, the burden shifts to the Social Security Administration to establish that a significant number of other jobs are available in the national economy which the claimant can perform.  20 C.F.R. §§ 404.1520(f), 416.920(f).

21.     Social Security - Vocational Expert - Hypothetical.  In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989). The ALJ is afforded "great latitude in posing hypothetical questions," Koonce v. Apfel, No. 98-1144, 1999 WL 7864, at *5 (4th Cir. Jan.11, 1999)[6], and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations.  Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988).

22.     Vocational Expert Purpose.  "The purpose of bringing in a vocation expert is to

---

[6] See FN 5.

assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." Cline v. Chater, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at *4 (4th Cir. Apr. 19, 1996). "[R]equiring the testimony of a vocational expert is discretionary." Hall v. Harris, 658 F.2d 260, 267 (4th Cir. 1981).

C.     Discussion

1.     The ALJ's Credibility Analysis is Not Supported by Substantial Evidence

Claimant asserts that the ALJ erred in determining her credibility. Specifically, Claimant contends that, although she was eligible for retirement benefits when she could no longer work, she was having difficulty performing her job for three years leading up to her decision that she could no longer work; her fibromyalgia, unlike her arthritis, has not been characterized as "mild"; her exercising regularly is not a basis for finding her testimony is not credible; and the ALJ's finding that she must be unable to perform the basic activities of daily living to be found disabled is an improper finding. Commissioner counters that the ALJ properly determined Claimant's credibility.

Unfortunately for Claimant, her argument is without merit. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 889 (4th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). The ALJ must apply a two-step analysis when assessing the credibility of a claimant's subjective complaints of pain. First, the ALJ must

expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

In this case, the ALJ correctly applied the Craig test. The ALJ found that Claimant's medically determinable impairments "could reasonably be expected to produce the alleged symptoms," but that Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are "not entirely credible." (Tr. 20). Specifically, the ALJ found that Claimant had osteoarthritis of the knees and neck and fibromyalgia. (Tr. 17). It is important to note that Claimant herself asserts that fibromyalgia, alone, has created the debilitating symptoms that caused her to be unable to work. (Pl. Br. at 6).

The ALJ considered Claimant's subjective complaints of debilitating symptoms in light of the entire record in accordance with the second prong of Craig and found that the objective evidence did not support the alleged severity of Claimant's complaints. (Tr. 20). The ALJ was in the best position to observe Claimant at the hearing and evaluate her credibility. The ALJ pointed to Claimant's daily activities, finding that they undermined her complaints of debilitating limitations. (Tr. 20). The ALJ noted that Claimant has a long history of exercising on a daily or weekly basis; provides for her personal hygiene; shops; does laundry and irons; cooks light meals; does light household chores; and uses Nautilus exercise equipment three times per week. (Tr. 20).

The ALJ found that "if the Claimant were truly disabled to the degree alleged, she could likely not perform the activities she described." (Tr. 20). The ALJ also found it significant that

Claimant indicated she had retired from her past work as a school administrator, rather than having to stop work because of her disability. (Tr. 20). Claimant, in her brief, cautions the Court that her testimony at the hearing was that she resigned due to her physical problems. (Pl. Br. at 5). The ALJ did not dispute that Claimant gave this testimony. However, in his thorough review of the medical records submitted in this case, the ALJ cited to a medical report that states, "[t]he patient is retired. She was an educator." (Tr. 285). Furthermore, Claimant was not diagnosed with fibromyalgia until two (2) years after she had retired from her position. The ALJ properly relied on the record in making his credibility determination.

Claimant next argues that the ALJ inaccurately found that her conditions were characterized as "mild" by her doctors. The fact that no doctor has characterized Claimant's fibromyalgia as "mild" does not render the ALJ's statement that "her physicians have generally characterized her impairments as 'mild' in nature" inaccurate. The objective medical evidence of record reveals that Claimant's physicians found her impairments to be mild. Two RFC assessments were completed and neither indicated Claimant would be unable to perform at least sedentary work. Dr. Houston diagnosed Claimant with fibromyalgia two years after she retired from her position as a school administrator. Even by this time, there was nothing in the record to indicate that Claimant's limitations were more than mild. In fact, Dr. Houston found she had a full range of motion in her elbows, shoulders, and a "slightly decreased" range of motion in her neck. (Tr. 210). He found her "[m]uscle strength is normal" and her "[g]ait is normal." (Tr. 210). Furthermore, on a follow-up visit after his initial diagnosis, Dr. Houston found that Claimant's stretching and exercise "has helped her a great deal and will continue to help her." (Tr. 244). Although Claimant's fibromyalgia was not characterized as "mild" by any of her

physicians, the ALJ's conclusion that her impairments are "mild" in nature is supported by the objective medical evidence of record.

Claimant next argues that the ALJ's finding that her testimony is not credible because she exercises regularly is an improper. She argues that her doctors have recommended that she exercise. Claimant notes that ALJs often hold the failure to follow doctor's instructions against such a claimant. She argues that in this case the ALJ is holding the fact that she is following her doctor's instructions against her.

The Undersigned sympathizes with Claimant in this regard. It is true that failure to follow a doctor's instructions often sounds the death knell for social security claimants. However, this Court's scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary. Hays, 907 F.2d at1456. Here the ALJ properly analyzed Claimant's exercise regimen and other daily activities as a factor in assessing her credibility. The regulations require him to do so. 20 C.F.R. §§ 404.1529(c)(3), 419.929(c)(3). Along with her exercise routine, the ALJ pointed out other daily activities, such as shopping, doing laundry and cooking. Such activities tend to show Claimant is capable of performing at least sedentary work. Furthermore, Courts have repeatedly upheld credibility determinations based on inconsistencies, such as the ones facing the ALJ in this case, between subjective complaints of pain and daily activities. See e.g., Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005).

Claimant's last argument regarding the ALJ's credibility analysis is that his finding that she must be unable to perform the basic activities of daily living in order to be found disabled is

an improper finding. Commissioner did not respond to this argument.

This argument lacks merit. The Undersigned does not see, nor does Claimant cite, any instance where the ALJ found that Claimant must be unable to perform basic activities of daily living in order to be found disabled. According to the Social Security regulations, the ALJ must consider a Claimant's daily activities when evaluating his or her credibility. 20 C.F.R. §§ 404.1529(c)(3), 419.929(c)(3).

Claimant cites two cases in an attempt to support her contention. First, she cites Brosnan v. Barnhart, 336 F.3d 671 (8th Cir. 2003) citing Kelley v. Callahan, 133 F.3d 583, 588-89 (8th Cir. 1998). The Kelley case held that "a person's ability to engage in personal activities such as cooking, cleaning, and hobbies does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." Id. The Undersigned agrees with the Kelley court. A person's ability to cook, clean, etc., standing alone, is not substantial evidence that she can engage in substantial gainful activity. However, the Kelley court also found that "a claimant's allegations of disabling pain may also be discredited by evidence that the claimant received minimal medical treatment and/or has taken only occasional pain medications." Id. The Claimant in Kelley took many prescription medications, availed herself of many pain treatment modalities, including TENS unit, physical therapy, trigger point injections of cortisone, chiropractic treatments, and nerve blocks. In addition, she had several surgeries, and many diagnostic tests, including x-rays, CT scans, DNA tests, MRIs, and blood work. Id. Such is not the case with Claimant here. The record, as a whole, supports the ALJ's credibility analysis.

Claimant also cites a Fourth Circuit case, Hines v. Barnhart, 453 F.3d 559 (4th Cir. 2006),

in an attempt to discredit the ALJ's credibility analysis in this case. Claimant's reliance on

<u>Hines</u> is misplaced, however, because <u>Hines</u> addressed the situation where an ALJ discredits

testimony regarding pain where there are no inconsistencies in the record. The ALJ in <u>Hines</u>

selectively cited evidence and the record there revealed no inconsistencies. The ALJ in the

instant case reviewed the entire record and found that Claimant's activities of daily living were

inconsistent with her testimony regarding pain, limitations and overall disability. This Court

agrees.      Having considered all the evidence in accordance with the second prong of <u>Craig</u>,

the ALJ is in the best position to determine Claimant's credibility. Although the ALJ

determined that Claimant had medically demonstrable severe impairments, the ALJ also

determined that Claimant's testimony was not fully credible and inconsistent with his medical

record.    (Tr. 20). Nonetheless, it should be noted that the ALJ still credited Claimant's

subjective complaints by limiting her to sedentary work. In light of the above discussion, the

ALJ properly assessed Claimant's credibility.

  2.  <u>The ALJ Failed to Carry His Burden in Showing That There Are Jobs Available to Which Claimant's Skills Would Directly Transfer</u>

  Claimant's final argument is that even if Claimant were found to be capable of full-time

sedentary work, the ALJ failed to carry his burden in showing that there are jobs available to

which her skills would directly transfer.

  Claimant's work as a high school principal was classified by the VE as light, skilled

work. (Tr. 338). At step five of the sequential analysis, the regulations require that individuals,

such as Claimant, who are of advanced age and limited to sedentary work, must have

transferrable skills sufficient to perform a new job with very little adjustment in order to make a

finding of non-disability. 20 C.F.R. § 404.1568(d)(4).

> If you are of advanced age (age 55 or older), and you have a severe impairment(s) that limits you to no more than sedentary work, we will find that you have skills that are transferrable to skilled or semiskilled sedentary work only if the sedentary work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry.

20 C.F.R. § 404.1568(d)(4); <u>see also</u> 20 C.F.R. pt. 404 subpt. P, app. 2, Rule 201.00(f).

Claimant's argument centers around the fact that the two jobs identified by the VE at the hearing, information clerk/receptionist and billing and cost rate clerk, are not in the industry where her skills originated.  Claimant's argument is flawed, however, because the regulation does not require that a claimant need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, *and* the industry.  Claimant misinterprets section 404.1568(d)(4).  This section only requires very little adjustment in tools, work processes, work settings *or* industry.  20 C.F.R. § 404.1568(d)(4) (*emphasis added*).  Claimant focuses her argument solely on the industry while ignoring the tools, work processes and work settings.  The Undersigned agrees that Claimant's past relevant work is not in the same industry as the jobs identified by the VE.  However, the test is whether the claimant can perform the new jobs "at a high degree of proficiency with a minimal amount of job orientation."  SSR 82-41.  Here, the ALJ found that Claimant has skills of universal application across industry lines, including interpersonal relationship skills, supervisory teaching skills, organizational skills, and computational skills.  (Tr. 21).  Claimant is very well educated and highly trained.  One could easily see how the skills Claimant acquired throughout her years as a high school teacher and administrator would easily transfer to other occupations such as information clerk/receptionist or billing and cost rate clerk.

Claimant's argument is without merit and the ALJ carried his burden in showing that

there are jobs available to which her skills directly transfer.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED** for the following reasons: 1) the ALJ's credibility analysis was supported by substantial evidence; and 2) the ALJ met his burden in showing that there are jobs available to which Claimant's skills would directly transfer.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons as set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: February 4, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE